OPINION OF THE COURT
Alan D. Oshrin, J.
With the recognition of the need to eliminate sexual harassment has come an awareness of how difficult the task will be (Harris v Forklift Sys., — US —, 114 S Ct 367 [1993], concurring opn Scalia, J.). The process of eliminating sexual harassment must go forward with recognition of the rights of all involved and without the creation of new wrongs. The process must be propelled by a sense of fairness and not motivated by any other less appropriate notions. Apparently Hofstra University (hereinafter Hofstra) ignored these precepts when considering the matter of Dr. Starishevsky (hereinafter Starishevsky) by failing to provide him with a hearing that came close to being fair and, accordingly, its actions for the reasons set forth below must be vacated and the petitioner must be *139 reinstated. This failure of process makes it impossible to consider any substantive issue.
The petitioner commenced a CPLR article 78 proceeding to annul a determination of Hofstra and James S. Shuart (hereinafter Shuart) as president of Hofstra, which terminated the petitioner’s employment effective March 18, 1993.
Starishevsky was employed by Hofstra as a psychologist and as an administrator and faculty member from 1965 until March 18, 1993. At the time of the February 1992 incident (the incident which directly led to this proceeding) and until his discharge Starishevsky was the director of the counseling center. Starishevsky’s employment was of indefinite duration and he served at the pleasure of the board of trustees.
In March of 1992, a Hofstra student, Alison Reutershan (hereinafter Reutershan), lodged a complaint of sexual harassment with the University’s affirmative action office. Reutershan alleged that on February 3, 1992 Starishevsky, the director of Hofstra’s counseling center, kissed her on the lips at the end of a counseling session. The University’s affirmative action officer, Roland Davis, obtained a written response from Starishevsky, interviewed Reutershan and Starishevsky and concluded that with no witness to the alleged incident, a finding of whether the alleged sexual harassment occurred could not be made. In April of 1992, the affirmative action office considered the case closed.
As the result of Reutershan’s pursuing the matter, coverage in the print and televised media, the allegations of Terese Corey Blanck (hereinafter Blanck) and Holly Seirup (hereinafter Seirup)[1] regarding 1988 incidents the investigation of the Reutershan complaint was reopened. In a December 23, 1992 memorandum from Frank Whelan Smith (hereinafter Smith), acting affirmative action officer, and M. Patricia Adamski (hereinafter Adamski), vice-dean and professor of law to Shuart regarding the investigation, Smith and Adamski summarize their findings and find "just cause” to recommend that the claims against Starishevsky be pursued by an appropriate subcommittee. It is significant that the memorandum indi *140 cotes that the impetus for investigating the Reutershan claim was the Blanck allegation. It is also significant that Smith and Adamski find "just cause” to send these allegations (plural) to a subcommittee in accordance with the University’s policy on sexual harassment.
Federal regulations implementing Title IX of the Education Amendments of 1972 provide that any educational institution which receives Federal financial assistance for any program or activity must adopt and publish a grievance procedure providing for prompt and equitable resolution of any complaint involving sexual discrimination (see, 34 CFR 106.8 [b]; 20 USC § 1681 et seq.). These regulations clearly require the creation of a process that will provide fairness to both the accuser and the accused. No other result could have been intended by the Congress nor permitted by the Office for Civil Rights in Education, the agency charged with adopting regulations appropriate to the enforcement of the statute.
Hofstra receives such assistance and in accordance with this regulation Hofstra’s affirmative action office published a pamphlet entitled "Sexual Harassment is Illegal”. The pamphlet indicates in pertinent part: "Complaints about sexual harassment will be responded to promptly and equitably. The right to confidentiality of all members of the academic community will be respected in both informal and formal procedures, insofar as is possible * * * An individual found to be guilty of sexual harassment is subject to disciplinary action for violations of this policy, consistent with existing procedures.”
The pamphlet further indicates if just cause is determined, the complaint will be reviewed by members of the sexual harassment subcommittee; that the subcommittee will consist of the provost, dean of students, personnel director, and a counseling center representative; and that if the committee determines that the University’s policy on sexual harassment has been violated, it will (1) pursue steps to effect an informal resolution; or (2) make a recommendation to the chief administrative officer or designate for corrective disciplinary measures or appropriate sanctions regarding the offender.
PREHEARING ACTIVITY
The hearing was ultimately scheduled to commence on January 26, 1993. Prior to that time, however, on January 19th Shuart issued a memorandum to the "Hofstra University Community” with respect to the incident and the hearing. In *141 this three-page memorandum Shuart discusses an allegation by a student (who is not named) against Starishevsky; fully describes the circumstances of the alleged occurrence; that the initial investigation failed to produce sufficient evidence to warrant any action against Starishevsky; that two women (who are not named) recently came forward to allege similar behavior by Starishevsky in 1988; that the case was reopened as a result of these other alleged occurrences; that a further investigation was conducted by Smith and Adamski, and Smith and Adamski recommended that there was "just cause” for further inquiry. Shuart also identifies the members of the panel and indicates that Starishevsky is on administrative leave with pay, pending a final decision by the president, and sets forth the date for the scheduled inquiry. After a very brief reference to an unrelated matter of alleged gender discrimination, Shuart discusses that the University’s procedures in these matters have been questioned; that the University’s policy is to thoroughly investigate both sides of these matters; the University’s concern with accuracy, objectivity and that the University will never allow itself to limit the rights of any or all parties involved in such cases.
Also, prior to the hearing the Smith-Adamski "just cause” memorandum was distributed to the members of the inquiry panel. This was done without discussion with Starishevsky’s counsel who thus had no opportunity to be heard on the appropriateness of disseminating such memorandum. Thus, before hearing the first word of testimony, this panel which was to sit "objectively”, had received for review the "just cause” memorandum which indicates that the Reutershan investigation was reopened because of the recent revelation of two alleged similar 1988 incidents, and which commented on the credibility of the statements of Blanck, Seirup and Reutershan, in addition to the memorandum addressed to the entire "Hofstra University Community”.
Thus, before the first day of testimony this inquiry process was tainted by procedural defects and improprieties. The sexual harassment guidelines call for a prompt response to a complaint. The initial response of Hofstra was prompt and resulted in a conclusion that a finding of sexual harassment could not be made because there were no independent witnesses to the alleged incident, together with the absolute denial by Starishevsky that the case should be closed. Reutershan alleges that Hofstra did not appropriately pursue and investigate her complaint in March of 1992. The record sup *142 ports this allegation. The lack of attentiveness on the part of Hofstra, however, does not provide a basis to reopen a closed investigation eight months after Starishevsky is advised that it is closed.
The sexual harassment guidelines call for respect for the right of confidentiality for all members of the academic community in informal and formal procedures insofar as possible. Hofstra made no attempt to respect Starishevsky’s right to confidentiality. The January 19th memorandum issued by Shuart to the "Hofstra University Community” names Starishevsky but not Reutershan, Blanck or Seirup, and makes reference to: the Reutershan incident in detail; the 1988 "similar” incidents; the reopened case; the "just cause” memorandum; Starishevsky’s administrative leave with pay, and the scheduled inquiry.
It is significant (as well as perplexing) that Shuart advised the panel members that their inquiry was broader than into the single allegation of sexual harassment; that they were being asked to make a recommendation as to Starishevsky’s future employment at Hofstra and that such recommendation need not be based solely on whether a finding of sexual harassment was made. This panel understood it was to weigh all facts and circumstances, including Starishevsky’s ability to effectively serve Hofstra and his prior employment record in determining what action, if any, should be taken against Starishevsky. Not only is this instruction from Shuart far beyond the scope and purpose on this inquiry into a single incident of sexual harassment, and in direct contravention of the policy guidelines, which limit the panel’s recommendations to a situation where sexual harassment has been found to have occurred, this instruction and the true nature, scope and purpose of the inquiry were not made known to Starishevsky.
Accordingly, Starishevsky could not know that he had to be prepared to defend his entire career at Hofstra, and be successful in that defense, to maintain his employment at Hofstra. Similarly with this broad inquiry, coupled with the "advice” being provided to Starishevsky by Hofstra, Starishevsky could not know that he had to be prepared to defend the Blanck and Seirup incidents, which purportedly were to go to "motive” only so as to maintain his employment at Hofstra, thus depriving Starishevsky of an opportunity to properly prepare a defense.
*143 HEARING ACTIVITY
Notwithstanding Shuart’s instructions to the panel and the panel’s understanding of the nature, scope and purpose of the hearing at the opening of the hearing, Robert Lewis, counsel for Hofstra, acknowledges that the only subject of the investigation is the Reutershan complaint. At the opening of the hearing Starishevsky learns for the first time that Reutershan would not be testifying first as scheduled. Early in the proceeding, Dr. Yuker, the chairman of the panel, states that "I think we can hear anything, but we’re most interested in recent incidents, meaning the last year or two”. Dr. Yuker then permitted witnesses to discuss incidents which occurred four years prior to the Reutershan incident, and five years prior to the hearing. Ultimately, an inordinate amount of time was devoted to the two 1988 incidents which were allowed into evidence purportedly for the sole purpose of indicating motive.
As will be discussed below, notwithstanding this "motive” testimony from Seirup and Blanck regarding "similar” incidents in 1988, and the testimony of Murphy in support of the Seirup and Blanck incidents (all of which is collateral to the subject of the inquiry), the panel did not conclude that the Reutershan incident constituted sexual harassment.
Testimony was received by the panel on January 25, 26, 27 and February 3, 1993. The hearing was closed on February 3rd at 7:45 p.m. with the completion of Starishevsky’s testimony. Later in the evening of February 3rd, two panel members, Dr. Michael Barnes and Dr. Liora Schmelkin, met with and privately interviewed a witness Lisa Haggerty (hereinafter Haggerty), the counselor who met with Reutershan a number of times after the subject incident. The other panel members declined to attend this meeting. The interview was approximately one hour in duration. Starishevsky was unaware of this witness interview. Inasmuch as Haggerty met with Reutershan a number of times in her capacity as counselor; maintained session notes which were not placed in Reutershan’s file; had Dr. Dean Parker (hereinafter Parker), who was antagonistic towards Starishevsky, as her mentor; attended a June 1992 meeting with Reutershan at Parker’s home, and had advised Reutershan as to ways by which Reutershan could pursue her allegations against Starishevsky, this private interview without the knowledge of Starishevsky and without an opportunity for cross-examination cannot be viewed as innocuous.
*144 POSTHEARING ACTIVITY
On March 2, 1993 the panel issued a memorandum to Shuart with their conclusions and recommendations. With respect to the kiss, the panel acknowledged that with "no witnesses to the alleged incident, a definitive conclusion based on the evidence is not possible” but that "the weight of the evidence indicates that Dr. Starishevsky probably did kiss Ms. Reutershan”. With respect to sexual harassment, under one definition the panel agreed that "one kiss did not constitute sexual harassment”. Under another definition the panel members were in disagreement "as to whether the kiss constituted sexual harassment”.
Under the sexual harassment guidelines, having been unable to find that the kiss constituted sexual harassment, the panel’s function was completed and no recommendations regarding disciplinary action or sanction could be made. The panel, however, imbued by Shuart with powers beyond the parameters of the sexual harassment guidelines went on to find "[rjegardless of whether the alleged behavior did or did not constitute sexual harassment, the panel members consider kissing a client to be unethical, unprofessional, and inappropriate”. The panel then recommended that: "in view of the present atmosphere on campus and the way this incident was handled in the past, a majority of the Panel members believe that Starishevsky should not remain at Hofstra University since they believe that his continuation here would be harmful to the institution. Since this incident by itself does not justify dismissal, prior to any action taken with regard to Dr. Starishevsky there should be a reexamination of his past record at Hofstra University including earlier complaints of any kind” (emphasis in original).
From a "probable kiss” which they could not agree constituted sexual harassment, this panel, while acknowledging that the incident by itself does not justify dismissal, expresses its belief that in view of the atmosphere on campus and the way the incident was handled in the past, Starishevsky should not remain at Hofstra. The panel makes no effort to veil the true basis for its recommendation; which is clearly not based upon a finding of sexual harassment.
By letter dated March 18, 1993 Shuart advises Starishevsky "[w]hile the panel did not reach a finding of sexual harassment, it found that you probably kissed Ms. Reutershan and that your behavior was unethical, unprofessional and inappro *145 priate” and that "[t]he panel further recommended that you not remain at Hofstra”. Shuart then advises that he has concluded "that the University no longer has confidence in your ability to function as a professional on campus” and that his "employment is terminated effective immediately”.
Shuart, who agrees with the panel that Starishevsky is not guilty of sexual harassment, terminates Starishevsky for inappropriate, unprofessional and unethical conduct and because Starishevsky does not have the confidence of the University to continue as a professional on campus. These are not bases for disciplinary action under the sexual harassment guidelines. Once the panel concluded that it could not find sexual harassment, it could not recommend disciplinary action or sanction because of alleged sexual harassment. Once Shuart agreed that Starishevsky is not guilty of sexual harassment he could not, under the guidelines, discipline or sanction Starishevsky. Terminating Starishevsky is in direct contravention of the plain language of the guidelines.
FAIR HEARING
New York law requires that a university’s decision to discipline a faculty member (or a student) be predicated on procedures which are fair and reasonable and which lend themselves to a reliable determination (see, Matter of Kwiatkowski v Ithaca Coll., 83 Misc 2d 43 [1975]). It is a matter of essential fairness in the somewhat one-sided relationship between the institution and the individual that when a university has adopted a rule or guideline establishing a disciplinary procedure, that such procedure be substantially observed and that in conducting the inquiry, the university must proceed in good faith (see, Tedeschi v Wagner Coll., 49 NY2d 652 [1980]; Matter of Gray v Canisius Coll., 76 AD2d 30 [1980]). It is basic that an individual facing a disciplinary type hearing is entitled to notice of the charges and an opportunity to respond. The dates and nature of the conduct which is the subject of the inquiry must be sufficiently precise to allow for the presentation of an intelligent defense (see, e.g., Matter of Ackerman v Ambach, 142 AD2d 842 [1988], affd 73 NY2d 323 [1989]).
Under the Federal law (20 USC § 1681 et seq.) and the Federal regulation (34 CFR 106.8 [b]) once an educational institution accepts Federal financial assistance, such educational institution must also accept the responsibility to comply *146 with Federal laws and Federal regulations concerning a complaint of sexual discrimination and comport with our society’s notion of fair play. This court expressly holds that under the Federal regulation an educational institution must develop, implement and execute a hearing procedure which is substantially fair in nature. The regulations adopted under congressional mandate must be read to require the adoption of a grievance procedure providing for prompt and equitable resolution of any complaint involving sexual discrimination, and can only have intended to require that an educational institution develop and implement a procedure which is fundamentally fair to both the accused and the accuser.
Whether viewed under New York law or Federal law it was incumbent upon Hofstra to afford Starishevsky a fundamentally fair and reasonable hearing. Here, without notice to Starishevsky, and in contradiction to the notice that Starishevsky in fact received (that there was to be an inquiry into the Reutershan complaint only) the panel is instructed that it is to look beyond the single allegation of sexual harassment, make a recommendation as to Starishevsky’s future employment and that such recommendation need not be based solely upon whether a finding of sexual harassment was made. As previously noted, the panel was made to understand that it was to weigh all facts and circumstances, including Starishevsky’s ability to effectively serve Hofstra and his prior employment record, in determining what action, if any, should be taken against Starishevsky.
These defects in procedure, coupled with others previously noted, are so egregious as to infect the entire proceeding with unfairness (see, Matter of Ackerman v Ambach, 142 AD2d 842, supra) of such a magnitude as to have led to substantial prejudice (see, Matter of Rudner v Board of Regents, 105 AD2d 555 [1984]) and a denial of justice (see, Matter of Sowa v Looney, 23 NY2d 329 [1968]), that the hearing process can be seen as nothing but fundamentally unfair and pursued in bad faith. Before the hearing was opened, therefore, Starishevsky’s right to a fair and reasonable hearing pursued in good faith had been violated. This lack of essential fairness and good faith continued during the inquiry process, as evidenced by the posthearing private interview of Haggerty which this court noted previously. This lack of essential fairness and good faith culminated in the panel’s and Shuart’s finding that Starishevsky was not guilty of sexual harassment but should no longer remain at Hofstra because of behavior which was *147 unethical, unprofessional and inappropriate (not bases for disciplinary action under the sexual harassment guidelines) and because of campus concerns.
The hearing procedures as adopted, implemented and executed by Hofstra denied Starishevsky his right to an elementally fair and reasonable hearing pursued in good faith under both State and Federal law.
ARTICLE 78 REVIEW
When a petitioner alleges that a university has internal rules and procedures to govern the subject of a hearing and that the university failed to abide by such rules and procedures, a CPLR article 78 proceeding is a proper mechanism for judicial review (see, Matter of Gray v Canisius Coll., 76 AD2d 30, supra; Matter of Kwiatkowski v Ithaca Coll., 82 Misc 2d 43, supra; Matter of Bonwitt v Albany Med. Ctr. School of Nursing, 77 Misc 2d 269 [1973]; Matter of Ryan v Hofstra Univ., 67 Misc 2d 651 [1971]). As noted previously, the Federal regulation implementing Title IX provides that the educational institution must adopt and publish a grievance procedure providing for prompt and equitable resolution of any complaint involving sexual harassment (34 CFR 106.8 [b]). The regulation does not mandate or even suggest a grievance procedure, leaving the creation of the grievance procedure to each educational institution; subject to the proviso that elemental fairness be provided to the accuser as well as the accused, perhaps in the form of respecting the right of privacy, giving due regard to the sensitive nature of the issue and the stigmatizing (unfortunate as this observation may be, it is true) nature of the complaint, with the accused being provided notice of the charges and afforded the opportunity to be represented by counsel, present a defense, and cross-exam-inc witnesses. Hofstra established such a procedure as is set forth in the pamphlet entitled "Sexual Harassment is Illegal” published by the affirmative action office. (Inasmuch as the rules provided by the pamphlet were not followed, it is unnecessary to address their apparent shortcomings.) Having established such grievance procedure Hofstra was obligated to comply with it and to insure a fair hearing. Starishevsky having alleged that Hofstra failed to abide by its own procedures, this article 78 proceeding is properly before this court.
In an article 78 proceeding for judicial review of a determination of an educational institution, the standard to be ap *148 plied is whether the action taken by the institution is arbitrary or capricious, or without rational basis or whether the institution has acted in good faith (see, Tedeschi v Wagner Coll., 49 NY2d 652, supra; Matter of Pell v Board of Educ., 34 NY2d 222 [1974]; Matter of Gray v Canisius Coll., 76 AD2d 30, supra). The arbitrary or capricious test has been said to chiefly relate to whether a particular action should have been taken, is justified or is without a foundation in fact or without a sound basis in reason (see, Matter of Pell v Board of Educ., 34 NY2d 222, supra).
Here the panel could not reach a conclusion that Starishevsky’s conduct constituted sexual harassment. Had the panel followed the plain language of the grievance procedure, they would have known not to proceed any further, and that they were without authority to recommend disciplinary action or sanction. Shuart’s instruction to the panel that their inquiry was broader than into a single incident of sexual harassment, that they were to make a recommendation as to Starishevsky’s future employment at Hofstra, and that such recommendation need not be based solely on whether a finding of sexual harassment was made, is in direct contravention to the grievance procedure in the sexual harassment guidelines and evidences Hofstra’s lack of good faith in the conduct of a hearing convened under its sexual harassment policy.
Moreover, Shuart reviews the proceeding and then agrees that Starishevsky is not guilty of sexual harassment. Having agreed that Starishevsky’s conduct did not constitute sexual harassment, Shuart could not under the grievance procedure discipline or sanction Starishevsky in any manner, let alone terminate his employment. Applying Hofstra’s own procedures there is no factual basis to support the termination of Starishevsky. Shuart’s determination to do so is arbitrary, capricious and without rational basis.
Reutershan filed her complaint under the sexual harassment grievance guidelines. The determination of just cause, although very much delayed, and the referral of the complaint for committee review was pursuant to such grievance guidelines. The recommendation for disciplinary action or sanction must also be pursuant to such grievance guidelines and cannot derive from private instructions and review and recommendation powers beyond those enumerated in the grievance guidelines. When the University made its determination, not upon the record but in an apparent reaction to what it believed was acceptable in the eyes of the community, and *149 then sought to justify the result without regard to the initial charge, the facts elicited, the guidelines, or the panel report, it acted in bad faith. Where, as here, the University "makes its determination not in the exercise of its sound and honest discretion but rather in bad faith or in a manner which is arbitrary and capricious, this action 'could never receive the sanction of a court in which even the semblance of justice was attempted to be administered’ ” (Matter of Gray v Canisius Coll., 76 AD2d 30, 34, supra).
Accordingly, the determination of Hofstra to terminate Starishevsky is annulled and Hofstra shall forthwith reinstate Starishevsky to his previous position as director of the counseling center.
AT-WILL DOCTRINE
For the reasons discussed below, the court finds that the at-will employment doctrine does not bar this court from reinstating Starishevsky to his previous position of director of the counseling center. The employment at-will doctrine is a judicially created common-law rule " 'that where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason’ ” (Wieder v Skala, 80 NY2d 628, 633 [1992], citing Murphy v American Home Prods. Corp., 58 NY2d 293, 300 [1983]). The doctrine as originally adopted in New York in 1895 was to be afforded no greater status than a rebuttable presumption (Weiner v McGraw-Hill, Inc., 57 NY2d 458 [1982], discussing Martin v New York Life Ins. Co., 148 NY 117 [1895]).
Generally, in New York, absent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual’s contract of employment, an employer’s right at any time to terminate an employment at will remains unimpaired (Murphy v American Home Prods. Corp., 58 NY2d 293, supra). If there is an express limitation on the employer’s right of discharge it would be given effect even though the employment contract was of indefinite duration (Murphy v American Home Prods. Corp., supra). It has been held that on an appropriate evidentiary showing, a limitation on the employer’s right to terminate an employment of indefinite duration might be imported from an express provision therefor found in the employer’s handbook on personnel policies and procedures (Weiner v McGraw-Hill, Inc., 57 NY2d 458, supra).
*150 This "express limitation” exception to the at-will discharge rule is a context-sensitive exception, the applicability of which must be determined by the court from the actions of both employer and employee in relation to a writing that is alleged to constitute an express limitation on an employer’s right of discharge (Gorrill v Icelandair/Flugleidir, 761 F2d 847, 851 [1985]). In determining the applicability of the "express limitation” exception the court is to consider the totality of the circumstances attendant upon the employment relationship (see, Gorrill v Icelandair/Flugleidir, 761 F2d 847, supra, discussing Weiner v McGraw-Hill, Inc., 57 NY2d 458, supra, and Tiranno v Sears, Roebuck & Co., 99 AD2d 675 [1984]; Collins v Hoselton Datsun, 120 AD2d 952 [1986]; Yaris v Arnot-Ogden Mem. Hosp., 891 F2d 51 [1989]).
The court finds that such an express limitation on the right to terminate, albeit itself limited, is found in the Federal regulations (34 CFR 106.8 [b]) and the references to the sexual harassment policy statement and the grievance procedure as set forth in the pamphlet entitled "Sexual Harassment is Illegal”. Unlike the cases in which the courts have held that broad statements of policy guidelines;[2] enumeration of grounds for termination;[3] description of grievance procedure[4] or a general statement regarding equal employment or nondiscrimination[5] do not necessarily constitute such an express limitation, in the case at bar the unambiguous language of the sexual harassment policy statement that "[a]n individual found to be guilty of sexual harassment is subject to disciplinary action for violations of this policy, consistent with existing procedures” and the equally unambiguous language of the grievance procedure that "[i]f the committee determines that the University Policy on sexual harassment has been violated it will * * * make a recommendation * * * for corrective disciplinary measures or appropriate sanctions”, must be read to expressly limit the University’s right to terminate the *151 employment of an individual accused of sexual harassment and who is processed under the sexual harassment grievance procedure, to individuals who are actually found guilty of the allegations of sexual harassment lodged against such individuals.
This limitation on the right to discharge the at-will employee is of course limited to the situation where the employee is accused of conduct amounting to sexual harassment and such complaint is processed under the grievance procedure set forth in the pamphlet. That Starishevsky came to Hofstra before the adoption of the policy is unimportant. His employment status was renewed annually from 1965 to 1992. The pamphlet was issued for the first time in 1988 and was distributed throughout Hofstra. Inasmuch as his employment period is year to year, this pamphlet can be said to apply to his service subsequent to its adoption. Moreover, Starishevsky was clearly aware of the pamphlet and the policies and guidelines contained therein, from prior to the time of Reutershan’s complaint in March of 1992, nearly one year prior to the disciplinary hearing held herein.
Additionally, looking to the attendant circumstances it is clear that both Starishevsky and Hofstra understood that the inquiry was to be in accord with the grievance procedure contained in the sexual harassment guidelines. By letter dated January 4, 1993, Shuart advises Starishevsky that there has been a finding of "just cause” for further inquiry into the allegation of sexual harassment against Starishevsky; that following University procedures, Shuart is convening a panel to conduct that inquiry, and that while the inquiry is in process and until the panel makes recommendations to Shuart, Starishevsky was to be on administrative leave with full salary and benefits. It is fairly inferable that upon completion of the inquiry process and a finding that Starishevsky was not guilty of sexual harassment that Starishevsky would be reinstated to his previous position. Had the panel followed the grievance procedures rather than Shuart’s private instructions, there could have been no recommendation that Starishevsky not continue at Hofstra and he should have been reinstated as director of the counseling center.
This court cannot permit Hofstra to process Reutershan’s complaint under the grievance procedures; have the panel unable to find that Starishevsky’s conduct amounted to sexual harassment; have Shuart find that Starishevsky is not guilty of sexual harassment, and then terminate Starishevsky’s em *152 ployment on grounds that were not the basis of the inquiry and as to which Starishevsky had no opportunity to defend. The grievance procedures and the Federal regulations upon which they are founded provide for disciplinary measures or appropriate sanction upon a finding of sexual harassment. There being no such finding there can be no termination of employment.
Hofstra cannot under the guise of processing a sexual harassment complaint pursuant to its own grievance procedures, terminate Starishevsky’s employment because of a purported finding that his behavior though not amounting to sexual harassment is "unethical, unprofessional, and inappropriate” under the rules of the American Psychological Association. Had Hofstra wished to charge Starishevsky with conduct in violation of the American Psychological Association rules and proceed under that association’s rules, procedures and standards, it could have and should have done so. If Hofstra had concerns regarding Starishevsky’s credentials, judgment, professionalism and the University’s confidence in him, it could have and should have pursued such concerns through the appropriate University procedure.
In reviewing the employment-at-will doctrine, the court notes that many have had doubts as to its wisdom. Judge Fuchsberg observed in writing for the majority in Weiner v McGraw-Hill, Inc. (57 NY2d 458, 462, n 4, supra) that the at-will employment rule originated centuries ago as an adjunct to the law of master and servant in England; as far back as 1562, England placed statutory limits upon the power of an employer to terminate an employee unless there was " 'reasonable cause to do so’ ”;[6] when the doctrine was transplanted to the United States the rule had resumed its unconditional classical form;[7] that in later times the doctrine was to find a receptive legal environment in laissez-faire nineteenth century America, but that commencing with the great depression and continuing through the present there is growing support for remedial legislative action. Significantly, Judge Fuchsberg observes that the holding in Martin v New York Life Ins. Co. (148 NY 117, supra), the case through which the Court of Appeals adopted the at-will employment doctrine in *153 New York in 1895, was grounded essentially in a statement in Wood, Master and Servant (§ 136 [2d ed] 1886), in which the author relied on no more than "scant authority of questionable value” (at 463, n 5); the cases cited by Wood having been decided " 'entirely on their facts and none stand squarely for the general proposition that an indefinite hiring is terminable at will’ ” (supra)[8]
In commenting upon the bizarre origin of the termination-at-will rule Judge Meyer in his dissent in Murphy (58 NY2d, supra, at 308, n 1) observes in a footnote that: Martin v New York Life Ins. Co. (supra) accepted as correct the rule stated in section 136 of Wood, Master and Servant (2d ed) that " 'the fact that the compensation is measured at so much a day, month or year does not necessarily make such hiring a hiring for a day, month or year, but that in all such cases the contract may be put an end to by either party at any time, unless the time is fixed’ Martin’s adoption of the rule may fairly be characterized as bizarre in light of Wood’s concession that " '[i]n England it is held that a general hiring, or a hiring by the terms of which no time is fixed, is a hiring by the year’ ” (supra); the contrary statement of the rule in Adams v Fitzpatrick (125 NY 124 [1891]) in which the Court found that a hiring of indefinite duration was a hiring for one year, and the observation of the Court in Arentz v Morse Dry Dock & Repair Co. (249 NY 439 [1928]) concerning the logical inconsistency of a rule the ultimate statement of which is that permanent (as opposed to temporary) employment means nothing more than that the employment is to continue indefinitely and until one or the other of the parties wishes for some good reason to sever the relation.
Additionally, when the Court of Appeals adopted the at-will rule in Martin (supra) it afforded the rule no greater status than that of a rebuttable presumption. This rebuttable presumption in the past 100 years has evolved more into a substantive rule of law than an evidentiary expedient, with the Court of Appeals allowing for limited circumstances which are treated as showing a different intention and rebutting the presumption, and the Legislature having enacted but a few prohibitions upon discharge. [9]
*154 Judge Jones writing for the majority in Murphy (supra) acknowledges that "New York does recognize that in appropriate circumstances an obligation of good faith and fair dealing on the part of a party to a contract may be implied and, if implied will be enforced” (at 304),[10] but observes that "[n]o obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship” (supra). In the context of at-will employment, Judge Jones concludes that "it would be incongruous to say that an inference may be drawn that the employer impliedly agreed to a provision which would be destructive of his right of termination” (at 304-305).
Judge Meyer in his dissenting opinion in Murphy (supra) appropriately observes that there is implicit in all contracts the implied covenant of fair dealing and good faith; [11] that the good-faith obligation is " 'a contractual obligation of universal force which underlies all written agreements’ ” (at 311);[12] and that the law implies that the parties will not frustrate their contracts and that one party will not intentionally do anything to prevent the other party from carrying out his agreement.[13] Judge Meyer further observes that the Court of Appeals has read a good-faith requirement into an at-will broker’s commission contract[14] and into a claimed contract of permanent employment[15] and that the Restatement (Second) of Contracts § 205 recognizes that the duty of good faith and fair dealing includes the power to terminate an at-will contract. Judge Meyer concludes that "[tjhere is, moreover, no compelling policy reason to read the implied obligation of good faith out of contracts impliedly terminable at will” (at 313) *155 merely because no durational term had been expressed in the employment contract; and that "[t]o do so belies the 'universal force’ of the good faith obligation which, as we have seen, the law reads into 'all contracts’ ” (supra).
Given the much questioned authority underlying the Court of Appeals 1895 ruling in Martin v New York Life Ins. Co. (supra); the fact that 333 years before New York adopted this common-law at-will doctrine, England, the country of its origination, had statutorily limited termination to a "reasonable cause” basis; that the rule was never meant to be more than a rebuttable presumption; that all but eight States had already abrogated the doctrine or ameliorated its harshness by the time of the Murphy ruling[16] and the compelling analysis of Judge Meyer for reading the obligation of good faith and fair dealing into at-will employment contracts, this court concludes that this doctrine does not stand as a bar to the court’s determination.
[Portions of opinion omitted for purposes of publication.]

. In 1988 Seirup was the director of residential life at Hofstra. Seirup alleges that in the summer of 1988, after a conversation with Starishevsky in her office, Starishevsky came over to her desk and kissed her.
In 1988 Blanck was the assistant director of residential life. Blanck alleges that in August of 1988 at the close of a training session, which she moderated, when only she and Starishevsky remained in the room Starishevsky approached her, grabbed her arm and kissed her.

. See, e.g., Patrowich v Chemical Bank, 98 AD2d 318 (1984), appeal dismissed against defendant Chemical Bank 62 NY2d 801, affd against defendant Corney 63 NY2d 541 (1984); King v Cornell Univ., 81 AD2d 712 (1981).

. See, e.g., Novinger v Eden Park Health Servs., 167 AD2d 590 (1990), lv denied 77 NY2d 810 (1991); Marvin v Kent Nursing Home, 153 AD2d 553 (1989); Dickstein v Del Labs., 145 AD2d 408 (1988), lv denied 73 NY2d 709 (1989) .

. See, e.g., Matter of Fiammetta v St. Francis Hosp., 168 AD2d 556 (1990) ; King v Cornell Univ., 81 AD2d 712 (1981), supra.

. See, e.g., Blaise-Williams v Sumitomo Bank, 189 AD2d 584 (1993).

. Citing 1 Blackstone’s Commentaries, 131 (1878).

. Citing De Giuseppe, Effect of the Employment-At-Will Rule on Employee Rights to Job Security and Fringe Benefits, 10 Fordham Urb LJ 1, 3-4 Feerick, Employment At Will, NYLJ, Oct. 5, 1979, at 1, col 1.

. Citing De Giuseppe, op. cit, at 6, n 3.

. See, e.g., Judiciary Law § 519 which prohibits the discharge of an employee due to absence from employment for jury service; Executive Law § 296 (1) (e) which bars discharge of employees for opposing unlawful *154 discriminatory practices or for filing a complaint or participating in a proceeding under the Human Rights Law; Labor Law § 215 which prohibits the discharge of an employee for making a complaint about a violation of the Labor Law or for participating in a proceeding related to the Labor Law; Civil Rights Law § 47-a which concerns employment of persons with disabilities; Workers’ Compensation Law § 120 which prohibits discharge of employees who have claimed or attempted to claim compensation from the employer.

. Citing Wood v Duff-Gordon, 222 NY 88 (1917).

. Citing Van Valkenburgh, Nooger & Neville v Hayden Publ. Co., 30 NY2d 34 (1972).

. Citing Brassil v Maryland Cas. Co., 210 NY 235 (1914).

. Citing Grad v Roberts, 14 NY2d 70 (1964).

. Citing Sibbald v Bethlehem Iron Co., 83 NY 378 (1881); Goodman v Marcol, Inc., 261 NY 188 (1933).

. Citing Arentz v Morse Dry Dock & Repair Co., 249 NY 439 (1928), supra.

. See, Strasser, Employment-At-Will, The Death of a Doctrine?, Natl LJ, Jan. 20. 1986, at 1. col 3.